IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF SOUTH CAROLINA

Catherine Newkirk and Jerome Newkirk (2 cases),   )
)
)
Plaintiff,                                         )
)   Civil Action No.:
vs.                                                )
)
James Enzor, individually and
in his official capacity, and
the South Carolina Department of Public Safety.  )
)
Defendant.                          )

## Expert Report of Brian S. Batterton

1. My name is Brian S. Batterton. I have been actively involved in police practices and law enforcement since 1994. I am currently an active police officer at the rank of police captain.

2. My education includes a Bachelor of Science Degree in the Criminal Justice from Georgia State University in Atlanta, Georgia and a Juris Doctor from John Marshall Law School in Atlanta, Georgia. I am an active member of the State Bar of Georgia.

3. I am currently on the Legal and Professional Advisory Board of the Legal and Liability Risk Management Institute, an organization associated with the Public Agency Training Council. These organizations provide training and other consulting services to law enforcement agencies throughout the United States. As part of the Legal and Liability Risk Management Institute, I conduct policy and legal training for law enforcement agencies and school officials throughout

the United States. I also author articles related to various law enforcement topics that are sent to law enforcement officers and school officials throughout the United States.

4. Since 2006, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, and attorneys. I have provided training in the following areas:

   a. Policy development for public safety agencies.
   b. Legal Issues in police use of force.
   c. Police misconduct/civil liability.
   d. Arrest, Search and Seizure, & Interrogation.
   e. Racial profiling.
   f. Legal issues in public schools.
   g. Constitutional update for law enforcement officers.
   h. Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

5. I am currently police Captain for the Cobb County (GA) Police Department in Marietta, Georgia. I have been employed by the Cobb County Police Department since 1995. During my tenure there, I have served in the following capacities: a patrol officer in the Uniform Patrol Division; a detective in the Detective Bureau; a Corporal in the Training Unit; a sergeant in the Uniform Patrol Division; a sergeant in the Office of the Chief of Police in the capacity of Legal Officer; a lieutenant in the Office of the Chief of Police in the capacity of Adjutant and Legal Officer; and as a captain in the capacity of the

Administrative Bureau Commander and Legal Officer. I am currently assigned as the Police Academy Director for the Cobb County Department of Public Safety Training Center. During most of my career, I have had an active role in training, particularly regarding issues of criminal procedure and criminal law, and policy research and development.

6. Since 2001, I have taught numerous courses at the Cobb County Police Department on criminal procedure, to include Fourth Amendment issues in search and seizure, Fifth and Sixth Amendment issues as it relates to police interviews, interrogation and right to counsel, legal aspects of use of force, pursuits and emergency vehicle operations and police policy and procedure. I have taught these topics to police recruits, veteran patrol officers, detectives, as well as supervisors and command staff.

7. Since 2006, my job duties as Legal Officer have required me to review various disciplinary matters and investigations of police officer misconduct on behalf of the Chief of Police and provide advice to the Chief on such matters. As the Police Academy Director, I review vehicle pursuits and officers involved uses of force.

8. As a member of the Legal & Liability Risk Management Institute Board of Advisor's, I have researched and assisted in drafting policies for law enforcement agencies relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination &

sexual misconduct, domestic violence, and dealing with the mentally ill. I have also conducted training on the above topics to various law enforcement officers and school officials nationally.

9. I also write articles related to law enforcement practice and law for the Public Agency Training Council and the Legal and Liability Risk Management Institute. Such articles can be found free of charge on the internet at patc.com.

10. In 2009, I was a featured speaker at the South Carolina Municipal Association Conference on the topic of technology used for law enforcement.

11. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

12. I have reviewed the following materials to date regarding this case:

a. Complaint of Catherine Newkirk v. Enzor and SCDPS;
b. Complaint of Jerome Newkirk v. Enzor and SCDPS;
c. OPR Investigative Report and included documents;
d. Trooper Enzor's Incident Report;
e. Arrest Warrant of Jerome Newkirk;
f. Expert Report of Jeffrey Noble (Plaintiff's expert);
g. Deposition of Jeffrey Noble from August 1, 2014;
h. Deposition of Trooper Enzor; and
i. S.C. Code Sections 16-9-320, 16-5-50, and 56-25-30.

13. My opinions expressed in this expert report are based upon the materials reviewed above. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my education and continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and

supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind, I recognize that there may be additional documentation as the case progresses. In the event that additional material is produced I shall be prepared to supplement this report.

14. At the outset it is important to note that this report is based upon the facts as presented by the material and, as much as possible, specifically avoids drawing conclusions based upon credibility issues of the parties.

15. This factual synopsis is based upon all documents reviewed and relies heavily upon the patrol car video of Trooper Enzor and Trooper Lee. On or about October 14, 2012, at approximately 17:36 hours (all times in this report are approximate), Trooper Enzor, using LIDAR, observed a black Cadillac Escalade traveling 77 mph in a 55 mph zone on I95 near Florence, S.C. Trooper Enzor conducted a traffic stop of that vehicle and radioed the stop to his dispatch center. He approached the vehicle on the passenger side and began speaking with the driver, later identified as Catherine Newkirk at approximately 17:36:55. Jerome Newkirk, Catherine's husband, was the front seat passenger. In summary, Trooper Enzor told Mrs. Newkirk that he "got her at 77." She is heard disputing the fact that she was speeding although it's difficult to fully understand all she says. Trooper Enzor is heard telling her it was two miles back and explaining the location to her. He then asked, for and received her registration and insurance and walked back to his patrol vehicle at approximately 17:38:20 hours.

16. Trooper Enzor returned to the passenger side of Mrs. Newkirk's vehicle at approximately 17:43:20. He hands what appears to be Mrs. Newkirk's license and registration into the vehicle with his right hand, and the citation is in his left hand. He leans his left arm with the citation into the vehicle but he does not appear, based on his arm movement, to hand over the citation to Mrs. Newkirk. Trooper Enzor explained that he wrote the citation for 64 in a 55 to help her. Mrs. Newkirk can be heard disputing the speeding charge, and she stated that she thinks there is "discrimination" taking place. Trooper Enzor, who is very calm at this point, tells her to step out of the vehicle. The time is 17:43:50. Trooper Enzor explained in his deposition that he instructed Mrs. Newkirk to exit her vehicle so he could explain the citation and her options to her. He then walked to the rear of the Escalade to meet with Mrs. Newkirk.

17. At 17:43:55, Trooper Enzor met with Mrs. Newkirk at the driver's side rear of the Escalade. When she was approximately 3-4 feet from him, he stated "Let me tell you something…" Trooper Enzor pointed quickly at Mrs. Newkirk and then to the rear of the vehicle as if indicating where he wanted her to stand. Mrs. Newkirk said "No…" and then turned to her left toward the direction of the driver's door of her vehicle. At 17:43:58, after she said "no" and turned toward her vehicle, Trooper Enzor told her she was under arrest, and he took hold of her right wrist. Mrs. Newkirk exclaimed "No" and pulled away from him and began to actively resist Trooper Enzor's attempt to handcuff and arrest her. She pulled back and used her strength and body movement to prevent him from placing handcuffs on her wrists. Trooper Enzor then struggled with Mrs.

Newkirk on the side of the busy interstate as she resisted arrest. At 17:44:10, Trooper Enzor again told Mrs. Newkirk she was under arrest, and she still continued to resist. At this point, Mr. Newkirk exited the passenger side of the vehicle and walked back to Trooper Enzor and Mrs. Newkirk. Trooper Enzor shouted a verbal command to Mr. Newkirk. It is unclear on audio the content of that command. Trooper Enzor then engaged in a struggle with Mrs. Newkirk as she actively resisted him by using her strength and body movements to prevent him from handcuffing her. He told her at least four (4) times to "put her hands behind her back," and she did not comply. He also told her at least five (5) times to "quit resisting." Trooper Enzor momentarily ceased trying to handcuff Mrs. Newkirk and radioed for back-up. Mrs. Newkirk said something to the effect of "call for help 'cause you're gonna need it sir." At this point she was unsecure, and Mr. Newkirk had not yet entered his vehicle as commanded. Trooper Enzor again told Mrs. Newkirk at least two (2) more times to put her hands behind her back, and he was finally able to handcuff her at 17:45:02. Mr. Newkirk is seen on video continuing to talk or shout; it is unclear what was being said based on the video. However, Trooper Enzor stated in his report that Mr. Newkirk was telling Mrs. Newkirk not to put her hands behind her back and was yelling at them throughout his attempt to handcuff her. He ordered Mr. Newkirk to get in the Escalade at least two (2) times before he partially complied, although he did not sit fully in the vehicle (one foot was on the ground which could facilitate a hasty exit from the vehicle). Further, prior to

entering the vehicle, Mr. Newkirk is seen on video leaning into the vehicle while reaching for something.

18. At approximately 17:45:20, Trooper Enzor advised Mrs. Newkirk of her rights under *Miranda*. Trooper Enzor then walked Mrs. Newkirk to the rear door of his patrol car, and she refused to enter the car, despite the repeated commands given to do so. During this process, Mr. Newkirk stepped partially out of the Escalade and yelled at the Trooper Enzor while pointing an object in his direction. Trooper Enzor yelled to him to get in the car at least two (2) more times and Mr. Newkirk continued to yell and point. At this point, Trooper Enzor said "you're under arrest too" at approximately 17:45:42. Mr. Newkirk then shut the door of his vehicle.

19. At 17:46:35, Trooper Lee can be heard arriving on scene to assist Trooper Enzor. Trooper Lee attempted to assist with getting Mrs. Newkirk to enter Trooper Enzor's car. They each had her by an arm, in a support hold, and she sat onto the ground. They helped ease her gently to the ground as she sat down. Trooper Lee then went to the Escalade at Trooper Enzor's instruction and handcuffed Mr. Newkirk without incident. Meanwhile, Mrs. Newkirk continued to scream at the troopers "you think you're in South Carolina, you can get away with this!" "It's over, it's over." "You will pay dearly!" (Note: Mrs. Newkirk said more than this; these are merely examples of what she said.) During this time, the troopers were calmly trying to talk Mrs. Newkirk into entering the vehicle. Mrs. Newkirk continued to argue and refuse to get into the police vehicle until 17:51 hours (by Trooper Lee's video). At approximately 17:55,

Mrs. Newkirk tried to kick the windows out of the Trooper Enzor's vehicle and was complaining that the handcuffs hurt. They had her exit the vehicle for her comfort and called for a transport vehicle.

20. After Trooper Enzor arrived at the jail, he contacted Corporal Tart, his supervisor and advised him of the incident. Corporal Tart provided advice to Trooper Enzor regarding what offense should be used to charge Mr. Newkirk.

21. Based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training, traffic stops are known to be fraught with danger for police officers. According to the FBI, between 2003 and 2012, approximately 58,705 officers have been assaulted in traffic pursuit/stop scenarios. (See– http://www.fbi.gov/about-us/cjis/ucr/leoka/2012/2012-figures/figure-4). Additionally, of 535 officers killed in the line of duty in the same time period, 17.9%, or approximately 96 have been killed during traffic stop incidents. (Id.)

22. It is my opinion based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training that the facts described above, crediting Trooper Enzor's testimony and absent any evidence to the contrary, show that Trooper Enzor's initial stop of Mrs. Newkirk for speeding was consistent with proper law enforcement practice in that the trooper had probable cause to believe that Mrs. Newkirk was violating the state speeding statute.

23. It is my opinion based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training that Trooper Enzor did not act contrary to proper law enforcement practice when he told Mrs. Newkirk to exit the vehicle so he could further explain the citation to her. This is because, in his initial position of explaining the citation from the passenger side of the vehicle, Mrs. Newkirk continued to argue or dispute the citation. She also made a comment that the trooper was discriminating against her. At times, an officer will elect to separate parties when one party is argumentative so as to have the person's sole attention and so that, if there was motivation to "act out" for the benefit of the other person, that incentive is removed. As such, it is not improper for the trooper to exercise his discretion and have Mrs. Newkirk step to the rear of her vehicle, in view of his patrol vehicle's camera, to further discuss the matter and to properly issue the citation in view of the camera.

24. It is my opinion based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training that another reasonable officer in Trooper Enzor's position could have believed that, when she exited the vehicle so he could explain the citation and she stated "No…" and turned back toward the drivers door of the vehicle that she was refusing to comply and accept the citation, as she was turning to walk away, which is the opposite of listening to the trooper and accepting the citation.

Further, there is no evidence to suggest that Trooper Enzor initially handed Mrs. Newkirk the citation and then took it back. On the patrol car video, one can observe that while his left forearm was resting on the door/window area, and the citation was in the vehicle so the trooper could explain the citation, there was no grabbing movement or additional movement of the troopers arm which would support the Newkirk's statement that the trooper took the citation back from her. Trooper Enzor denies that he had given the citation to Mrs. Newkirk at that point and therefore denies taking it back. Further, Mrs. Newkirk was arguing against the citation as Trooper Enzor was attempting to explain it. As such, it is my opinion that another reasonable officer in the same situation could have believed that Mrs. Newkirk refused to accept the citation. Further, S.C. Code Section 56-25-30 only mandates allowing a person to proceed without having to post a bond if that person accepts the citation; since a reasonable officer could have believed Mrs. Newkirk refused to accept the citation, it is my opinion that Trooper Enzor acted within generally accepted proper law enforcement procedures when he attempted to require Mrs. Newkirk to post a bond by arresting her.

25. It is my opinion based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training that the facts described in Paragraph 17, and as seen on Trooper Enzor's video, were sufficient to cause a reasonable officer in the same situation to believe that

probable cause existed to arrest Mrs. Newkirk for a violation of S.C. Code Section 16-9-320(A). This statute states, in pertinent part, the following:

> *It is unlawful for a person knowingly and wilfully to oppose or resist a law enforcement officer in serving, executing, or attempting to serve or execute a legal writ or process or to resist an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer, whether under process or not.*

As applied to Mrs. Newkirk, she opposed Trooper Enzor as he sought to issue her a citation in that she said "No" and turned to walk away from him. Further, when he tried to affect her arrest, she actively resisted that arrest by using her strength and turning her body to prevent Trooper Enzor from gaining control of her arms so that he could apply handcuffs. It was evident that Trooper Enzor, in full uniform, was a law enforcement officer and this was never disputed. As such, Trooper Enzor acted consistent with generally accepted proper law enforcement practice in arresting Mrs. Newkirk.

26. It is my opinion based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training that Trooper Enzor used force in accordance with generally accepted proper law enforcement procedures during the arrest of Mrs. Newkirk. Generally, officers are trained that they should consider (1) the seriousness of the offense, (2) the threat posed by the suspect (based on the totality of the circumstances), and (3)

whether the suspect was actively resisting or attempting to evade arrest by flight. (see *Graham v. Connor*, 490 U.S. 386 (1989)). In this case, while Mrs. Newkirk was being arrested for speeding and resisting arrest, the threat posed by her conduct was significant. First, she was struggling with the trooper on the side of a busy interstate. Second, she was approximately 50 pounds heavier than the trooper. Third, Mrs. Newkirk's husband was on-scene and out the vehicle, adding to the threat to the trooper during the arrest. Mr. Newkirk was approximately 6'3" tall and 200 pounds, while Trooper Enzor was approximately 5'11" tall and 170 pounds. Further, Mr. Newkirk was reaching into the vehicle during the arrest. It is commonly known that traffic stops are fraught with danger for police as stated in Paragraph 21. As to Mrs. Newkirk's resistance, it is my opinion that she was actively resisting arrest. The U.S. Department of Justice/Bureau of Justice Assistance, in "Conducted Energy Devices: Development of Standards for Consistency and Guidance" by James M. Cronin and Joshua A. Ederheimer defined "*active resistance*" as *physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, pushing, or verbally signaling an intention to avoid or prevent being taken into or retained in custody.* In contrast, "*passive resistance*" was defined as *physical actions that do not prevent the officer's attempt to control, for example, a person who remains in a limp, prone position, passive demonstrators, etc.* Additionally, in *Police Chief* Magazine, Michael E. Miller, PhD, in "Taser Use and the Use-of-Force Continuum: Examining the Effect of Policy Change" (September 2010), defined "active resistance" as *"the subject's*

*actions are intended to facilitate an escape or prevent and arrest; the action is not likely to cause injury."* It is my opinion that Mrs. Newkirk was actively resisting Trooper Enzor's attempt to arrest her by using her strength to prevent him from gaining control of her wrists and by turning her body in a manner to prevent handcuffing, all while failing to comply with verbal commands to quit resisting and to put her hands behind her back. As such, it is my opinion that Trooper Enzor's use of force in only using soft, empty hand control tactics (no strikes or intermediate weapons were used) with Mrs. Newkirk in an attempt to gain control of her arms to handcuff her (as seen on the video) was in accordance with generally accepted proper law enforcement practice.

27. It is my opinion based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training that Trooper Enzor and Trooper Lee acted in accordance with generally accepted police practice in their handling of Mrs. Newkirk when she refused to enter the police vehicle. Each trooper had Mrs. Newkirk under an arm and Trooper Lee was calmly asking her to enter the vehicle. Mrs. Newkirk then let her body go limp and sat on the ground. Each trooper helped slowly ease her down to prevent her from striking the ground. Ultimately, Mrs. Newkirk entered the vehicle under her own power. I do note that once in the police vehicle, she continued to be unruly, kicking at the windows and complaining the handcuffs were too tight. The troopers had her exit the vehicle for her comfort while waiting on a different means of transportation for Mrs. Newkirk. In my opinion,

this was also in accordance with generally accepted proper law enforcement procedure.

28. It is my opinion based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, education, and continued research, writing, and training that the facts described in Paragraphs 17 and 18, and as seen on Trooper Enzor's video, and as described by Trooper Enzor, were sufficient to cause a reasonable officer in the same situation to believe that probable cause existed to arrest Mr. Newkirk for a violation of S.C. Code Section 16-5-50. While ultimately, the charge was determined to not be appropriate, as it only applies to hindering arrests regarding civil rights, I note that Trooper Enzor consulted with Corporal Tart who believed that charge was appropriate. Further, Trooper Enzor also relayed the facts when applying for the warrant to the Magistrate, who also thought believed probable cause existed and issued the warrant. As such, it is my opinion that Trooper Enzor acted within the proper standard of care in choosing his charge and acted in accordance with generally accepted proper law enforcement procedure in arresting Mr. Newkirk. However, it is also my opinion that another reasonable officer could have believed probable cause was also present to charge Mr. Newkirk with S.C. Code Section 16-9-320(A). This statute states, in pertinent part, the following:

> *It is unlawful for a person knowingly and wilfully to oppose or resist a law enforcement officer in serving, executing, or attempting to serve or execute a legal writ or process or to*

> *resist an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer, whether under process or not.*

In this case, it is my opinion that the facts described in Paragraph's 17 and 18, and seen on Trooper Enzor's video tape, could cause another reasonable officer to believe that Mr. Newkirk's conduct opposed Trooper Enzor in serving the citation in that according to Trooper Enzor, Mr. Newkirk was yelling for Mrs. Newkirk to resist and yelling at and distracting Trooper Enzor, by pointing at him with an object, and going in and out of the vehicle in a reaching motion as he attempted to arrest Mrs. Newkirk. As such, it is my opinion that Trooper Enzor acted in accordance with generally accepted proper law enforcement procedure in his decision to arrest Mr. Newkirk.

29. At this stage of my review I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

30. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

31. My fees for this professional service is a flat case development fee of $7500.00 paid to the Public Agency Training Council and a fee of $2500 for a deposition

in Marietta, Georgia or $2500 per day plus expenses for services away from Marietta, Georgia including depositions and trial appearances.

This report is signed on this 9th day of October, 2014 in Marietta, Georgia.

Brian S. Batterton